**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **L-3 COMMUNICATIONS** | ) | |
| **CORPORATION** *et al.*, | ) | |
|    **Plaintiff,** | ) | |
| | ) | **Case No. 1:15-cv-701** |
|       **v.** | ) | **Related case: 1:17-mc-26** |
| | ) | |
| **SERCO, INC.,** | ) | |
|    **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiffs, L-3 Communications Corporation and L-3 Applied Technologies, Inc. ("plaintiffs"), specialize in High Altitude Electro-Magnetic Pulse ("HEMP") testing and maintenance, which is necessary to prevent EMPs from damaging mission-critical military equipment. Defendant Serco, Inc. ("Serco") held a prime contract with the United States Air Force that included the provision of HEMP testing. Because Serco did not have the ability to offer HEMP-related services, Serco subcontracted with plaintiffs' predecessor, L-3 Services, to provide HEMP services to the Air Force. Plaintiffs argue that Serco then helped employees at L-3 Services steal L-3 Services' trade secrets and redirect bids for HEMP services to which plaintiffs were entitled to Jaxon, a company formed by former L-3 employees.

After extended litigation in three courts,[1] spanning over a decade and involving many of the same issues, and after full discovery in this case, Serco now moves for summary judgment. At issue are the following questions: (i) whether plaintiffs' claims are time-barred, and (ii) whether plaintiffs possessed a valid contractual or business expectancy in receiving HEMP-related Task Orders from Serco.

---

[1] *See L-3 Commc'ns Corp. v. Jaxon Engineering*, 125 F. Supp. 3d 1155 (D. Co. 2012); *L-3 Commc'ns Corp. v. Serco Inc.*, Case No. 2014-05946 (Fairfax May 1, 2014).

1

The matter has been fully briefed and argued, and is now ripe for disposition.

## I.

The entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). That is the situation here. Pursuant to Local Rule 56(B) and the Rule 16(b) Scheduling Order issued in this case, a motion for summary judgment must contain a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists. *See L-3 Commc'ns Corp. v. Serco, Inc.*, No. 1:15-cv-701 (E.D. Va. Aug. 5, 2015) (Order). Both parties fully complied with Local Rule 56(B) and the Scheduling Order. The following list of undisputed material facts is based on Serco's statement of undisputed material facts and plaintiffs' response to that statement.

- Plaintiff, L-3 Communications Corporation is a Delaware corporation headquartered in New York, NY. The other plaintiff, L-3 ATI, is a Delaware corporation with its principal place of business in San Diego California. L-3 ATI is the successor in interest to L-3 Services, which performed HEMP-related services.

- Defendant, Serco, Inc., is a defense contractor which held the prime contract with the U.S. Air Force to provide a number of services at the U.S. Air Force Space Command. Serco is a New Jersey corporation headquartered in Reston, VA.

- On April 14, 2004, the Air Force awarded a prime contract to Serco,[2] which required Serco to provide a number of services to the Air Force, including testing and upgrading Air Force sites to protect them from HEMP events, such as nuclear explosions. The prime contract is performed in Serco's Colorado Springs, Colorado office because the Air Force headquarters is located in Colorado.

- On December 30, 2004, Serco awarded Subcontract No. SI-2004-SC203333 (the "Subcontract") to the Titan Corporation ("Titan"), thepredecessor to L-3 Services. The Subcontract between Serco and Titan provides that the Subcontract is the sole source of Task Orders and that the Subcontract's terms govern any Task Orders Serco might issue to Titan. *See id.* § H.31. The Subcontract further provides that the subcontractor is prohibited from assigning the Subcontract without Serco's written consent, which Serco

---

[2] At the time Serco was awarded the prime contract with the Air Force, Serco was called SI International Engineering, Inc.

may withhold in its discretion. *See id.* § H9. The Subcontract also includes a limitation of liability clause, written in all capital letters that limits the availability of lost profit damages. § H.11

- Under the Subcontract, Serco issued Requests for Proposals ("RFPs") to Titan seeking bids on various Task Orders to be issued under the Subcontract. These RFPs stated that "Serco also reserves the right to make one award, multiple awards, or no award, depending on the best interest of Serco," and that "Serco may reject any and all offers or waive informalities and minor irregularities in the proposals received." *See, e.g.*, Ex. 7.

- On March 18, 2008, Serco and Titan entered into a modification of the Subcontract for the purpose of "chang[ing] the name of the Subcontractor to L-3 Services." *See* Def. Ex. 3. This modification identifies L-3 Services as the named Subcontractor, and L-3 Services is also the signatory. *See id.* L-3 Services' HEMP business was located in Colorado. L-3 Services was the predecessor to L-3 ATI, one of the plaintiffs in this case. L-3 Communications Corporation, the other plaintiff, was the parent company of L-3 Services.

- On June 6, 2008, L-3 Services' employee Randy White incorporated Jaxon with his wife, Joni White, in Colorado. In early December 2008, Randy White informed Serco Program Manager Donald Eich that he planned to retire from L-3, and later that month, White officially announced his retirement from L-3 Services.

- Jaxon received its first RFP from Serco on March 3, 2009, and on June 30, 2009, Serco's Colorado Springs office entered Subcontract No. S2TM9SC407 with Jaxon.

- Serco retained its Subcontract with L-3 Services and continued to award Task Orders to L-3 Services, Jaxon, and others from 2009 to 2014.

- On August 18, 2009, L-3 Services employee Charles Crain recommended to L-3 Services that a letter be sent to Serco warning that if Serco allowed Jaxon to use L-3 Service's technology, it would "become a party to pirating IP and could be subject to civil litigation." *See* Ex. 27 at 83, 310-13, Ex. 16.

- In October and November 2009, Crain filed an ethics complaint against Jaxon and Serco with L-3 Services and the Air Force Inspector General. Plaintiffs contended in the ethics complaint that Randy White, Scott White, Susie Rettig, Jim Youngman, and John McClure breached their employment agreements in 2008 by stealing L-3 Services' trade secrets and customer lists to assist in the formation of Jaxon. *See* Ex. 29 at 199. The Air Force investigated the complaint, but no action was taken.

- On November 23, 2010, L-3 Services and L-3 Communications filed a complaint against Jaxon and various Jaxon personnel in the U.S. District Court for the District of Colorado (the "Colorado Action"). Although Serco was not named in the suit, the lawsuit alleged that Serco had participated in an "illegal scheme" beginning in 2007. See Ex. 9 ¶ 75. On February 11, 2011, L-3 Services and L-3 Communications filed an Amended Complaint with similar allegations against Serco. The various L-3 entities and Jaxon settled the

Colorado action on March 4, 2016. All claims were settled and Jaxon obtained a release from the L-3 entities.

- On November 9, 2011, while the litigation with Jaxon was ongoing, L-3 went though a corporate restructuring. L-3 ATI, a new corporation and one of the plaintiffs in this case, was incorporated in Delaware, and on December 11, 2011, L-3 Services and L-3 ATI entered into a Contribution Agreement by which certain assets were transferred from L-3 Services to L-3 ATI. The Contribution Agreement excluded transfer of any asset for which prior consent was required. This exclusion included L-3 Services' Subcontract with Serco.

- On May 1, 2014, L-3 Communications and L-3 ATI (but not L-3 Services) filed a complaint against Serco in the Circuit Court for Fairfax County (the Fairfax Action). Plaintiffs alleged that collusion between Serco and Jaxon began well before Serco first began awarding Task Orders to Jaxon in 2009, including an allegation that White had colluded with Serco in 2008. The Fairfax Action asserted claims against Serco for: (i) tortious intereference with employment agreements; (ii) tortious interference with a contract or business expectancy; (iii) civil conspiracy; and (iv) statutory business conspiracy under Va. Code § 18.2-499, 500. On September 30, 2014, plaintiffs filed an Amended Complaint in the Fairfax Action, detailing further misconduct of Serco and Jaxon beginning in 2008. Soon after the filing of the Amended Complaint, Serco filed a Demurrer and Plea in Bar.

- On May 1, 2015, the Fairfax Court sustained the Demurrer in part, ruling that Colorado law applied to the case and that plaintiffs' business expectancy and business conspiracy claims must be dismissed because those claims do not exist under Colorado law. The state court judge identified five acts in Colorado that completed the alleged tort and gave rise to L-3's claims: (i) Serco's alleged exclusion of L-3 from the bidding process for the 2009 Task Orders; (ii) Serco's alleged failure to publicly advertise most of the 2009 Task Orders; (iii) Serco's alleged prevention of L-3 from submitting competitive bids; (iv) Serco's alleged bid rigging; and (v) Serco's alleged teaming with Jaxon, despite its alleged knowledge that Jaxon was using L-3's proprietary information. The state court judge held that "all the alleged acts previously cited which occurred in Colorado and prior to Serco's termination of L-3's business expectancy were sufficient to be deemed the last act necessary to make L-3's claim for tortious interference with business expectancy actionable. As such, this Court has determined that Colorado law applies."

- Plaintiffs nonsuited the Fairfax Action effective May 29, 2015.

- On June 3, 2015, shortly after non-suiting the Fairfax action, plaintiffs filed a complaint in the Eastern District of Virginia. On September 2, 2015, plaintiffs filed an amended complaint, and Serco filed a motion to dismiss.

- On October 30, 2015, the federal district judge originally assigned to the case[3] granted Serco's Rule 12(b)(1) motion to dismiss for lack of standing. As Judge Lee explained, "the subcontract is the center of the dispute . . . [a]nd since the subcontract does not name either [plaintiff] and neither [plaintiff] is an assignee of the contract, then they cannot have any business expectancy which arise[s] outside of the contract."

- Plaintiffs appealed and the Fourth Circuit reversed. *See L-3 Commc'ns Corp. v. Serco, Inc.*, 673 Fed. Appx. 284, 285 (4th Cir. 2016) (unpublished). The Fourth Circuit explained that, while plaintiffs' allegations were sufficient to establish standing at the pleading stage, "[t]he separate but related question whether [plaintiffs] have alleged business expectancy is one properly considered under Federal Rule of Civil Procedure 12(b)(6) or on a motion for summary judgment." *Id.*

- The case was returned to the district court and a scheduling order was entered. Serco sought leave to file a 12(b)(6) motion. By Order, the federal district judge originally assigned to the case denied the request for leave to file a 12(b)(6) motion and informed the parties that neither was permitted to file or renew ant dispositive motions until the completion of discovery. *See L-3 Commc'ns Corp. v. Serco, Inc.*, No. 1:15-cv-701 (E.D. Va. June 8, 2017).

Having completed discovery, Serco now seeks summary judgment, alleging that plaintiffs' claims are either time-barred or fail as a matter of law.

## II.

The summary judgment standard is too well-settled to merit extended discussion, and the parties do not dispute this standard. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed.R.Civ.P. It is settled that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. On the other hand, a genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, the party opposing summary judgment may not rest upon mere allegations and

---

[3] Judge Gerald Bruce Lee, the judge first assigned this case, has since retired.

denials, and must instead "set forth specific facts showing that there is a genuine issue for trial." *Id.* And "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

## III.

Serco argues that all of plaintiffs' claims are either time-barred or fail as a matter of law. Each of these arguments is addressed below.

As an initial matter, it is necessary to decide which state's law governs the statute of limitations questions presented here. It is well-established that a federal court sitting in diversity applies the choice of law rules of the forum state. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941). In Virginia, procedural rules are governed by the law of the forum state, and statutes of limitations are considered procedural rules. *Jones v. R.S. Jones & Associates, Inc.*, 246 Va. 3, 4-5 (Va. 1993).[4] Therefore, Virginia's statute of limitations applies to plaintiffs' claims.

Also of note, is that plaintiffs asserted some claims asserted here against Serco in the Fairfax Action on May 1, 2014, thereby tolling the statute of limitations period with respect to those claims for the period during which those claims were pending. Serco argues that this tolling has no effect here because all of plaintiffs' claims asserted here accrued before May 1, 2009, and that the limitations period therefore expired before the Fairfax Action was filed in May 2014. This argument will be addressed in the context of each of the counts below.

---

[4] Virginia law does recognize an exception where a statute of limitations is part of or integral to the cause of action. *Com. v. Owens-Corning Fiberglas Corp.*, 238 Va. 595, 599-600 (Va. 1989) ("substantive or 'special' statutes of limitation . . . are ordinarily contained in statutes which create a new right and become elements of that newly-created right, restricting its availability. Compliance with such a statute is a condition precedent to maintenance of a claim")

## A.

### 1.

The parties agree that Virginia's five-year statute of limitations for claims arising out of injuries to property interests applies to plaintiffs' tortious interference and conspiracy to commit tortious interference claims in Counts 1-68.  *See* Va. Code. § 8.01-243(B); *see also Dunlap v. Cottman Transmission Systems, LLC*, 287 Va. 207, 222 (Va. 2014) (applying a five-year statute of limitations to tortious interference claims).  Generally, the statute of limitations begins to run as soon as a plaintiff suffers an injury sufficient to give rise to a cause of action, even if other injuries occur later in time.  *See Detrick v. Panalpina*, 108 F.3d 529, 543 (4th Cir. 1997); *Locke v. Johns-Manville Corp.*, 221 Va. 951, 957 (Va. 1981).

Serco argues that Counts 1-68 should be treated as a single tort for purposes of the statute of limitations because plaintiffs' expectancy was based on plaintiffs' view that plaintiffs were or should be the sole provider of HEMP-related services.  Plaintiffs argue that they held an independent expectancy in the issuance of each HEMP-related Task Order, and so a new tort with a new limitations period was committed each time Serco directed a HEMP-related Task Order to Jaxon instead of plaintiffs.  Under Serco's theory, plaintiffs' claims would be time-barred, whereas plaintiffs' theory would allow plaintiffs to proceed on the tortious interference claims because the first Task Order was granted to Jaxon in July 2009, two months within the limitations period and within five years of plaintiffs' filing of the Fairfax Action.

Serco's theory that the plaintiffs' expectancy was being the sole provider of HEMP-related Task Orders, rather than in each individual Task Order, is incorrect.  Under the theory asserted in plaintiffs' complaint, plaintiffs had an expectancy in each independent Task Order, and thus any act to interfere with the expectancy in each Task Order constituted an independent

tort. Serco's theory is contradicted by the way in which Task Orders were awarded; the record reflects that Serco independently evaluated bids for each individual Task Order, and had the discretion to decide to whom the Task Orders should issue. *See* Subcontract at § H.9.a. Thus, an interference with the process for any one of those Task Orders would constitute an independent tort that would constitute the kind of "injury sufficient to give rise to a cause of action." *Panalpina*, 108 F.3d at 543. Actionable harm for each count of tortious interference occurred when Serco deprived plaintiffs of Task Orders to which plaintiffs allege they were entitled. Thus, any alleged expectancy in the Task Orders was deprived at the moment that Serco awarded the Task Order to Jaxon rather than plaintiffs. Accordingly, all of plaintiffs' tortious interference claims are timely, with the first claim becoming actionable in May 2009 when Serco awarded the first Task Order to Jaxon rather than plaintiffs.

## 2.

Even though plaintiffs' tortious interference with contract or business expectancy claims are not time-barred, that does not end the inquiry. This is so because Serco argues that plaintiffs cannot prove that they held a valid contractual or business expectancy in receipt of HEMP-related Task Orders. Specifically, Serco argues that the Subcontract between Serco and plaintiffs' predecessor, L-3 Services, is controlling with respect to the parties' relationship and that the Subcontract disavows any obligation to grant plaintiffs Task Orders for HEMP-related projects. Plaintiffs' argue that the Subcontract does not bar their tort claims because the expectancy plaintiffs seek recovery for was created by a course-of-dealing with Serco in which Serco had awarded plaintiffs' predecessor Task Orders. Thus, it is necessary to decide what effect, if any, the existence of the Subcontract between Serco and L-3 Services has on plaintiffs' claims.

Preliminarily, it is necessary to decide what law governs plaintiffs' tortious interference claims. The parties do not take a position on whether Virginia or Colorado law applies; both sides believe they win under either Virginia or Colorado law and that there is no need to decide which state's law is applicable. Regardless, it is still necessary to determine which state's law applies. It is well-settled that federal courts apply the conflicts laws of the state in which they reside. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941). Virginia's choice of law rules largely mirror the Restatement (First) of Conflict of Laws. *See Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). Thus, torts are governed by the law of the place of the wrong, the law of "the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement of Conflict of Laws § 277 (1934); *see also Quillen*, 789 F.2d at 1044 ("Under Virginia law, the 'place of the wrong' is the place where 'the last event necessary to make an [actor] liable for an alleged tort takes place."). In most cases, the last event consummating the tort is the event causing injury, and so the place of the wrong is effectively the place of the injury. *Id.* The law of the place of the wrong also governs tortious interference claims. *See Collelo v. Geographic Servs. Inc.*, 283 Va. 56 (Va. 2012); *Gen. Assurance of Am. V. Overby-Seawell*, 533 F. App'x 200, 206 (4th Cir. 2013).

Although much of the activity in this case occurred in Colorado – the personnel for the companies involved worked in Colorado and the HEMP-related work all occurred in Colorado – the undisputed factual record reflects that the decision about whether to issue HEMP-related Task Orders to L-3 Services was ultimately made at Serco's Reston, Virginia headquarters. Donald Eich, Serco's program manager responsible for issuance of HEMP-related Task Orders explained at his deposition that he believed that headquarters personnel were involved "toward the end as a review, as a contractual review" in determining whether to award Task Orders. Eich

Dep. at 227:8-12. Furthermore, Task Orders awarded to Jaxon were consistently approved by Serco employees in Reston, Virginia. *See, e.g.*, Gatanas Dep. at 274:1-275:22. Thus, the interference with plaintiffs' alleged business expectancy in the Task Orders occurred in Virginia and became actionable at the moment that Serco executives in Reston denied L-3 Services the Task Orders. Therefore, the last event consummating the tortious interference claims occurred each time in Virginia, not in Colorado, and therefore Virginia law applies to govern plaintiffs' tortious interference claims.[5]

Under Virginia law, a prima facie showing of tortious interference requires (i) the existence of a valid contractual relationship or business expectancy, (ii) knowledge of the relationship or expectancy on the part of defendants, (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (iv) resultant damage to the party whose relationship or expectancy has been disrupted. *Chaves v. Johnson*, 230 Va. 112, 121 (Va. 1985). Thus, to establish a claim for tortious interference against Serco, plaintiffs must demonstrate that they had a valid contractual relationship with Serco entitling them to receive Task Orders or business expectancy in the Task Orders.

With respect to the first element – the existence of a valid contractual relationship or business expectancy – it is clear that plaintiffs do not have a valid contractual relationship with Serco on which to base their tortious interference claims. L-3 Communications and L-3 ATI, were not parties to the Subcontract, and so they had no valid claim to entitlement to Task Orders arising out of the Subcontract. Plaintiffs are correct that the Subcontract allowed for assignment

---

[5] Although Serco notes that the U.S. District Court in Colorado applied Colorado law to L-3 Services' claims against Jaxon, it is noteworthy that the choice of law conclusion reached by the Colorado court is not inconsistent with the choice of law here because Jaxon was the defendant in the Colorado action and Jaxon's acts to interfere with L-3 Services' business all took place in Colorado. *See L-3 Commc'ns Corp. v. Jaxon Engineering*, 125 F. Supp. 3d 1155 (D. Co. 2012).

with Serco's consent, and that one of the plaintiffs, L-3 Communications, had signed a Contribution Agreement granting L-3 Communications all of L-3 Services' assets. *See* Ex. 2. The Contribution Agreement between L-3 Communications and L-3 Services explicitly stated that it did not assign any any assets from L-3 Services to L-3 Communications that required third-party consent for assignment. *See* Ex. 2 at § H9. The Subcontract between Serco and L-3 Services states that any assignment requires the consent of Serco, and the undisputed record shows that Serco did not consent to assignment of the contract. *See* Crain Dep. at 41-42. Therefore, plaintiffs have no valid contractual relationship entitling either of them to Task Orders issued under the Subcontract between Serco and L-3 Services.

Furthermore, even if plaintiffs had been valid parties to the Subcontract, that Subcontract explicitly stated that subcontractors had no entitlement or expectancy in future Task Orders. The Subcontract states that the "Prime Contractor has no obligation to issue and there is no guaranty to Subcontractor that it will receive any work under the terms of this Subcontract, or that a [Task Order] will be issued in response to a Task Order proposal submitted by the Subcontractor." Subcontract at §§ B.1, B.3. Thus, even if plaintiffs were parties to the Subcontract, the Subcontract did not create a valid, contractual expectancy in the receipt of any particular Task Order.

To avoid the unambiguous language of the Subcontract, plaintiffs argue that they held a business expectancy, rather than a contractual expectancy, in receiving the Task Orders because of the course-of-dealing between Serco and L-3 Services. This argument ignores that L-3 Services' expectancy in Task Orders, if any, did not arise out of an independent course of dealing between L-3 Services and Serco because the Subcontract between L-3 Services and Serco governed the parties' relationship. Moreover, the undisputed record evidence establishes that all

Task Orders issued by Serco to L-3 Services were awarded under the terms of the Subcontract. *See* Crain Dep. at 50. There were no HEMP-related Task Orders issued outside of the Subcontract, and all the work performed by L-3 Services in connection with HEMP services was governed by the terms of the Subcontract. Furthermore, the Subcontract between L-3 Services and Serco stated that it was the exclusive source of Task Orders. Ex. 2 at ¶ B.10. Accordingly, any business expectancy in HEMP-related Task Orders arose solely from the contractual relationship between the parties.

RFPs issued by Serco when it awarded Task Orders also make clear that subcontractors, such as L-3 Services and plaintiffs, were entitled to receive Task Orders only if they had agreed to enter a Subcontract with Serco. The RFPs state that the "subcontract will be the basis for the contractual agreement between the successful offeror and Serco." See Serco RFP, Ex. 7 at 2. Plaintiffs' own corporate designee admitted as much at his deposition, stating that all Task Orders L-3 Services had received for HEMP-related work had been issued pursuant to the Subcontract. *See* Crain Dep. at 50. Plaintiffs' government contracts expert, Barbara Kinosky, made similar admissions, acknowledging that "[t]he task orders would have been issued under the subcontract." *See* Kinosky Dep. at 94:17-18. The undisputed record shows that there was no course-of-dealing independent of the subcontractual relationship between Serco and L-3 Services. Serco and L-3 Services' relationship and course-of-dealing were always governed by the terms of the Subcontract between the two parties and RFPs issued in association with Task Orders. Thus, the course-of-dealing argument fails because plaintiffs cannot establish that there was a course-of-dealing different or distinct from the contractual relationship.[6] Put differently,

---

[6] Plaintiffs argue that bidding was not controlled by the Subcontract, but was instead controlled by the terms of the RFPs issued in relation to solicitation of bids for each Task Order. That argument does not help plaintiffs, however,

there is no independent course-of-dealing where, as here, a contract governs the relations of the parties.

Plaintiffs argue, however, that the fact that L-3 Services had won every HEMP-related bid established a business expectancy in the continuing receipt of bids, irrespective of what the Subcontract stated. On this theory, because L-3 Services had won every HEMP-related Task Order prior to Jaxon's entry into the bidding process, L-3 Services and the plaintiffs were entitled to continue to receive all HEMP-related Task Orders regardless of the language in the Subcontract. In support of this theory, plaintiffs rely primarily on the Supreme Court of Virginia's decision in *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 48 (1995), which held that it was a jury question whether the defendant and a third party had conspired to destroy the plaintiffs' reasonable business expectancy in the renewal of a contract. According to plaintiffs, *Bellsouth* states that it is a factual question for a jury whether a plaintiff's prior dealings with a defendant are sufficient to create a reasonable business expectancy in continuing to perform work.

*Bellsouth* is readily distinguishable from this case. In *Bellsouth*, there was no contract governing the renewal of the contract at issue or governing the continuing relationship of the parties after the contract was extinguished. Thus, course-of-dealing was the only basis on which to determine whether there was an expectancy in the renewal of the contract. By contrast, in this case, the Subcontract between L-3 Services and Serco controlled the award of any new Task Orders, and so the Subcontract, not a course of dealing, provided terms that governed the ongoing relationship between the parties. Accordingly, *Bellsouth* is of no aid to plaintiffs in this case.

---

because the RFPs state that a bid will not be accepted unless the bidding party agrees to a Subcontract between Serco and the bidding party governing the issuance of Task Orders.

13

Not only is plaintiffs' reliance on *Bellsouth* misplaced, but plaintiffs also failed to cite the successor case to *Bellsouth – Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292 (Va. 1997) – which considered whether course-of-dealing between the parties could create a valid business expectancy after a contract's term had ended. By contrast, the Subcontract here was ongoing, and continued to govern the award of Task Orders by Serco to L-3 Services, and so *Halifax* is also inapposite.[7]

In sum, plaintiffs' tortious interference with business expectancy claim fails because plaintiffs have not established that they had either a valid contractual relationship entitling plaintiffs to receive HEMP-related Task Orders or a business expectancy in the continued receipt of Task Orders. Plaintiffs have no claim to entitlement to Task Orders under the Subcontract because plaintiffs were not parties to the Subcontract, and because L-3 Services could not assign the Subcontract to plaintiffs without Serco's consent, which in this case never occurred. Even assuming plaintiffs had a claim that they had been validly assigned rights under the Subcontract, plaintiffs' claims would still fail because the Subcontract clearly states there was no entitlement to receive Task Orders under the Subcontract. Finally, plaintiffs' course-of-dealing theory fails because the undisputed record evidence demonstrates that Serco awarded Task Orders to L-3 Services pursuant to the Subcontract, not pursuant to an independent course of dealing separate from the Subcontract. Furthermore, allowing plaintiffs to establish an entitlement to Task Orders despite the existence of a contractual relationship between L-3 Services and Serco would allow plaintiffs to circumvent the terms of a binding contract by pleading a case in tort. Such a theory

---

[7] Even assuming that course-of-dealing was established and was a valid basis for plaintiffs' tortious interference claims, the Supreme Court of Virginia held in Halifax that in order to proceed on a course-of-dealing theory, a plaintiff must present evidence of more than its subjective belief that it was qualified or performing well in order to establish that, but for the wrongdoing, it would in fact have continued to receive work. *Halifax Corp.*, 253 Va. at 303. Plaintiffs here have presented no evidence showing that Serco would have granted them Task Orders in the absence of agreement to a Subcontract, and the undisputed record evidence demonstrates that Serco required bidding parties to agree to a Subcontract in order to award Task Orders.

is unsupported by Virginia law.  *See 17th Street Assoc's, LLP v. Markel Int'l Ins. Co. Ltd.*, 373 F. Supp. 2d 584, 599 (E.D. Va. 2005) (dismissing expectancy claim where "[t]he only relationship that exists is a contractual one . . . which, of course, is only actionable in contract").[8]  Where there is a contract governing the relationship between two parties, course-of-dealing cannot contradict the explicit terms of that contract by creating a tort action based on business expectancy.  Accordingly, plaintiffs' tortious interference claims in counts 1-34 fail.[9]

Because plaintiffs lack a valid contractual or business expectancy in the Task Orders at issue, plaintiffs' aiding and abetting claims in counts 35-68 also fail.  Any derivative claims arising out of plaintiffs' tortious interference claims fail because there is no tortious interference which Serco could "aid or abet."  Thus, dismissal of plaintiffs' tortious interference claims would also require dismissal of plaintiffs' aiding and abetting tortious interference claims in counts 35-68.

Even if plaintiffs' tortious interference claims survived, plaintiffs' aiding and abetting tortious interference claims would still fail because Virginia does not recognize an aiding and abetting theory of tort liability.  Plaintiffs cite a number of Virginia cases that allegedly recognize the principle that individuals assisting in the commission of a tort can be held jointly-liable for the tort.  *See Alliance Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12CV701-HEH, 2013 WL 143500, at *5 (E.D. Va. Jan. 11, 2013); A*valonBay Communities, Inc. v. Wilden*, No. 1:08-cv-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009), aff'd 392 F. App'x 209 (4th Cir.

---

[8] *See also Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292 (Va. 1997); *Copenhaver v. Rogers*, 238 Va. 361, 364 (Va. 1989) ("this is a case involving a claim solely for economic losses. It is settled in the Commonwealth that no cause of action exists in such cases absent privity of contract").

[9] The result reached here under Virginia law would be much the same were Colorado law to apply.  Colorado law rejects business expectancy claims based on course-of-dealing where an existing contract governs the relationship between the parties.  *See, e.g.*, *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo. Ct. App. 2004).  Accordingly, the Subcontract which governed the relationship between L-3 Services and Serco would preclude a course-of-dealing theory and plaintiffs' claims would fail.

2010); *Ratcliffe v. Walker*, 117 Va. 569, 579 (Va. 1915). Importantly, these cases do not recognize an aiding and abetting theory of liability; rather, they merely state the obvious point that two or more individuals who act jointly to interfere tortiously with a contract can both be held liable for that tort. Thus, plaintiffs' counts styled as "aiding and abetting" are simply a rehash of their tortious interference claims and are not independently actionable as separate causes of action for aiding and abetting under Virginia law.[10]

## B.

### 1.

Counts 69 and 70 allege common law and statutory civil conspiracy claims related to the alleged tortious interference with Task Orders. Again, the parties agree that the five-year limitations period for claims arising out of property interests applies to the conspiracy claims. *See* Va. Code. § 8.01-243(B); *see also Espejo v. George Mason Mortg., LLC*, No. 1:09-cv-1295, 2010 WL 447009 at *8 (E.D. Va. Feb. 2, 2010) (civil conspiracy); *Detrick v. Panalpina*, 108 F.3d 529, 543 (4th Cir. 1997) (statutory business conspiracy). A cause of action for conspiracy accrues at the time plaintiffs first suffered any damages resulting from the acts committed in furtherance of the conspiracy. *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997); *see also Eshbaugh v. Amoco Oil Co.*, 234 Va. 74 (Va. 1987).

The undisputed record evidence shows that plaintiffs suffered legally cognizable injuries from the alleged conspiracies before May 1, 2009, five years before plaintiffs filed the Fairfax

---

[10] Again, even if Colorado law applied, plaintiffs' claims would likely fail. At least one intermediate court in Colorado has recognized aiding and abetting liability in the context of breach of fiduciary duty claims. *See Holmes v. Young*, 885 P.2d 305, 308 (Colo. App. 1994). The Colorado Supreme Court has not recognized such claims, and there are no Colorado cases recognizing an aiding and abetting tortious interference claim where the only underlying expectancy is a non-contractual business expectancy, and there is no reason to create such a claim where state courts have not recognized it. *See Grayson v. Anderson*, 816 F.3d 262, 272 (4th Cir. 2016) (declining to "expand South Carolina law by recognizing a cause of action for aiding and abetting common law fraud"); *Thousand Oaks Barrel Co. v. Deep S. Barrels, LLC*, 241 F. Supp. 3d 708, 724-25 (E.D. Va. 2017) (declining to recognize new claim under Virginia law).

action.  Plaintiffs suffered injuries from the conspiracy in 2008 when Serco allegedly reached an agreement with employees of L-3 Services to form a separate company.  Plaintiffs allege that the conspiracy between Serco and L-3 Services' employees resulted in damages in the form of wages and benefits paid to those employees while the employees were using their time at L-3 to steal customer lists and other information.  Plaintiff also suffered injuries as a result of the conspiracy when they were first denied the opportunity to bid on Task Orders related to the Subcontract in March 2009.  Because these injuries stemmed directly from the conspiracies at issue, plaintiffs' conspiracy claims accrued before May 1, 2009 and are therefore time-barred.

Seeking to avoid this result, plaintiffs argue that there is a genuine dispute of material fact with regard to when the conspiracy began.  In support of this claim, plaintiff cites a statement by Jaxon's CEO questioning whether an agreement had been reached to exclude L-3 from bidding on Task Orders.  *See* Pl. Ex. 114.  At best, these emails would support the inference that Jaxon's CEO was unsure whether Serco would follow through on awarding Task Orders to Jaxon.  The emails do not suggest that the alleged conspiracy had not begun in 2008.  Therefore, there is no genuine dispute of material fact as to when the alleged injuries stemming from the conspiracy occurred, and the claims are therefore time-barred.

## 2.

Counts 69 and 70 also fail because plaintiffs cannot establish that plaintiffs had a valid business expectancy in receiving Task Orders from Serco, and therefore plaintiffs cannot show that Serco engaged in a common law civil conspiracy or a statutory business conspiracy to interfere tortiously with plaintiffs' business expectancies in Task Orders.  Accordingly, even if Counts 69 and 70 were not time-barred, they would still fail as a matter of law.

## C.

With respect to plaintiffs' Colorado Civil RICO claims alleged in counts 71-73, Colo. Rev. Stat. § 18-17-104(3) (1997) ("COCCA"), the parties dispute which statute of limitations is applicable. There is no express statute of limitations within COCCA, so Virginia law determines the limitations period. It is worth noting, however, that Colorado courts have stated that COCCA has a two-year limitations period under Colorado law. *See FDIC v. Refco Group, Ltd.*, 989 F. Supp. 1052, 1077 (D. Co. 1997).[11]

Plaintiffs argue that the five-year statute of limitations applies because the harm created by the alleged criminal enterprise was economic harm. Thus, plaintiffs argue that Virginia law compels the conclusion that Virginia's five-year statute of limitations controls. Serco argues that the two year statute of limitations for fraud claims applies because plaintiffs' COCCA claims sound in fraud, and claims that sound in fraud are held to the procedural requirements for fraud claims, even where fraud is not a specific element of the claims. *See* Va. Code §8.01-243(A) ("every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues").

Plaintiffs concede that their COCCA claims are based on an alleged "fraudulent scheme" involving acts of mail and wire fraud. *See* FAC ¶¶ 162, 167, 182. To avoid application of the fraud limitations period, however, plaintiffs argue that the harm felt as a result of the criminal conspiracy was economic harm, which the Supreme Court of Virginia has held is a "property right." *See Dunlap*, 287 Va. at 221. Plaintiffs' argument ignores the fact that the harm in fraud cases is almost always exclusively an economic harm. The fact that the damages resulting from a fraud take the form of the loss of a business expectancy does not convert a fraud claim into a

---

[11] S*ee also Todd Holding Co., Inc. v. Super Valu Stores, Inc.*, 90 CV 362 (Dist.Ct. Weld Co. Feb. 20, 1995), *on writ of prohibition, Super Valu Stores, Inc. v. District Court, Weld County, Colo.*, 906 P.2d 72 (Colo.1995) (COCCA actions subject to the two year statute of limitations).

contract claim for purposes of the statute of limitations. Because plaintiffs' COCCA claims sound in fraud, the two-year statute of limitations for fraud is the appropriate limitations period. Accordingly, these claims are time-barred because as demonstrated by plaintiffs' November 23, 2010 lawsuit in Colorado against Jaxon, alleging that Serco participated in an illegal scheme to deprive L-3 Services of bids, plaintiffs' knew of the alleged fraud well before June 2013.

## D.

Plaintiffs do not address Serco's argument that counts 74-78 – plaintiffs' tortious interference with employment contract claims – are time-barred. The five year statute of limitations for tortious interference with business expectancy claims applies to plaintiffs' employment contract interference counts. *Dunlap v. Cottman Transmission Systems, LLC*, 287 Va. 207, 222 (Va. 2014) (applying Va. Code § 8.01-243(B)'s limitation period to tortious interference claims). The statute of limitations begins to run as soon as the plaintiff is injured, even if additional recoverable injuries are incurred later. *See Detrick v. Panalpina*, 108 F.3d 529, 543 (4th Cir. 1997); *Locke v. Johns-Manville Corp.*, 221 Va. 951, 957 (Va. 1981).

Plaintiffs were injured, if at all, in 2008 when L-3 Services employees began working on behalf of Serco to steal secrets and customers while L-3 Services was still paying them. For example, Randy White allegedly breached his employment contract on behalf of Serco in 2008 when he breached the non-disclosure provisions of his contract with L-3 Services. The other employees who allegedly stole trade secrets while employed by L-3 Services, Scott White, Susie Rettig, James Youngman, and John McClure, were each alleged to have breached their contracts as early as "mid-ish 2008." *See* Ex 29 at 124-28. The undisputed record demonstrates that plaintiffs suffered any injury from Serco's tortious interference with its employment contracts in

2008, more than five years before plaintiffs filed the Fairfax Action and well outside the statute of limitations.  Thus, Counts 74-78 of the FAC are time-barred.

### E.

### 1.

Plaintiffs also failed to respond to Serco's argument that plaintiffs' negligent misrepresentation claim in Count 79 is barred by the statute of limitations.  In Virginia, negligent misrepresentation claims are subject to a two-year statute of limitations because they sound in fraud.  *See* Va. Code § 8.01-2439(A); *Hansen v. Stanley Martin Companies, Inc.*, 266 Va. 345, 354 (Va. 2003) ("Since [negligent misrepresentation] sounds in fraud, the two-year statute of limitations of Code § 8.01-243(A) applies").  The statute of limitations on a negligent misrepresentation claim begins to run from the date the fraud "is discovered of by the exercise of due diligence reasonable should have been discovered."  *Id.* (quoting Va. Code §§ 8.01-2439(A)).

The undisputed record evidence demonstrates that plaintiffs knew of the alleged negligent misrepresentations at least by the time plaintiffs filed their complaint against Jaxon in the Colorado case on November 23, 2010.  Thus, the statute of limitations would have run on November 23, 2012, well before plaintiffs filed either the Fairfax Action or this case. Accordingly, plaintiffs' negligent misrepresentation claim is time-barred and must be dismissed with prejudice.

### 2.

Even if plaintiffs' negligent misrepresentation claim was not time-barred, the claim would still fail as a matter of law.  To establish a negligent misrepresentation claim, plaintiffs must show (1) actionable misrepresentation, (2) causation, (3) reliance, and (4) damages.  *See*

*MainStreet Bank v. Nat'l Excavating Corp.*, 791 F. Supp. 2d 520, 532 (E.D. Va. 2011); *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, NA*, 892 P.2d 230, 237 (Colo. 1995) (en banc). Plaintiffs allege that Serco improperly directed bids to Jaxon, but they do not allege that the failure of Serco to disclose that information to plaintiffs caused any harm. The harm was caused not by any alleged negligent misrepresentation, but by the act of redirecting the bids. Plaintiffs also fail to demonstrate that their reliance on any representations by Serco would be reasonable. Plaintiffs knew of alleged misconduct by 2010, so they could not at any point after that reasonably rely on representations made by Serco with respect to bidding on Task Orders. Finally, there was no harm caused by Serco's alleged misrepresentations; instead all harm was a result of a failure to receive Task Orders.

For the foregoing reasons, Serco's motion for summary judgment must be granted. A separate Order will issue granting summary judgment in favor of Serco.

The Clerk is directed to provide a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
March 15, 2018

/s/

T. S. Ellis, III
United States District Judge